Opinion En Banc
The judgments entered in the district courts are affirmed by an equally divided en banc court. See Savard v. Rhode Island, 338 F.3d 23, 25 (1st Cir.2003) (en banc).
Opinions follow.
BARRON, Circuit Judge,
with whom TORRUELLA and THOMPSON, Circuit Judges, join.
Congress has long given the Attorney General discretion to decide whether to take aliens who are subject to removal into immigration custody. Congress also has long given the Attorney General discretion to decide whether to release on bond aliens who are in immigration custody while their removal proceedings are pending. Nearly thirty years ago, however, Congress began enacting a succession of similar but slightly revised immigration detention mandates that limited the Attorney General’s detention discretion in certain respects. These consolidated appeals require us to decide the scope of the present version of this detention mandate, codified in 8 U.S.C § 1226(c).
Much like its precursors, this detention mandate first directs that the Attorney General shall take into custody certain “criminal aliens” — as defined by their commission of specified offenses — “when [they are] released” from criminal custody. And, much like its precursors, this detention mandate then bars the Attorney Gen *19 eral from releasing certain aliens on bond once they have been placed in immigration custody. The key point of dispute concerns the class of aliens to whom this bar to bonded release applies.
We conclude that Congress intended for the present detention mandate to operate like its precursors and thus that its bar to bonded release applies only to those specified criminal aliens whom the Attorney General took into custody “when [they were] released” from criminal custody. We further conclude that the two aliens who bring these habeas petitions were not taken into immigration custody “when [they were] released” from criminal custody because they had been released from criminal custody years before their immigration custody started. As a result, we conclude that the present detention mandate does not bar either petitioner from seeking release on bond pursuant to the Attorney General’s discretionary release authority.
Two district courts of this Circuit reached the same conclusion in granting the petitioners the right to an individualized bond hearing at which they could seek release prior to the completion of the removal process. See Gordon v. Johnson, 991 F.Supp.2d 258 (D.Mass.2013); Cas-tañeda v. Souza, 952 F.Supp.2d 307 (D.Mass.2013). A panel of this Circuit affirmed. See Castañeda v. Souza, 769 F.3d 32 (1st Cir.2014). This Court then agreed to rehear the case en banc, and is now, by a vote of three to three, evenly divided. In consequence, the judgments of the district courts are affirmed, as we believe they should be given Congress’s evident intention not to deny aliens like petitioners the chance to seek bonded release, the consequential nature of the decision to deny aliens such a chance, and the reality that removal proceedings can stretch on for months or even years.
I.
The key parts of the Immigration and Nationality Act are codified in 8 U.S.C. § 1226, and, in particular, two subsections of it: (a) and (c).[1] Through subsection (a), Congress gave the Attorney General broad discretion to decide whether to take into custody an alien who is in the removal process. Congress also gave the Attorney General, through that same subsection, broad discretion to release on bond those aliens whom she had placed in custody so that they would not have to be detained for the often lengthy removal process.[2]
To govern the exercise of this release power, the Attorney General issued regulations pursuant to subsection (a). These regulations authorize immigration judges (subject to review by the Board of Immigration Appeals (BIA) and ultimately the Attorney General) to make individualized bond determinations based on a detainee’s flight risk and danger to the community. See 8 C.F.R. § 1236.1(c)(8), (d)(1), and (d)(3).
*20 As a result of § 1226(a) and its implementing regulations, these two petitioners, Leiticia Castañeda and Clayton Gordon, plainly may be detained for the entirety of the removal process if they are found to pose sufficient bond risks. There is a question, however, whether they must be detained for the entirety of that process regardless of the showing they could make at a bond hearing.
The question arises due to the contested scope of the limited exception to § 1226(a) that is carved out by § 1226(c). The exception appears in two paragraphs of subsection (c) under the single heading, “Detention of Criminal-Aliens.”[3]
Together, the paragraphs establish the latest version of a detention mandate Congress first enacted in 1988. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), tit. Ill § 303, Pub.L. No. 104-208, 110 Stat. 3009-546, 3009-585. In each prior version, Congress required first that the Attorney General “shall take into [immigration] custody any alien convicted” of an enumerated felony offense “upon completion” of the alien’s sentence (1988 mandate) or “upon [the alien’s] release” from criminal custody (later mandates). And, in each prior version, Congress then required that the Attorney Genera] “shall not release such felon from [immigration] custody.” See Anti-Drug Abuse Amendments Act of 1988, § 7343(a), Pub.L. No. 100-690, 102 Stat. 4181, 4470; Immigration Act of 1990, § 504(a), Pub.L. No. 101-649, 104 Stat. 4978, 5049-50; An-titerrorism and Effective Death Penalty Act of 1996 (AEDPA), § 440(c), Pub.L. No. 104-132,110 Stat. 1214,1277.
The version of the detention mandate that is at issue here was enacted in 1996 and follows this same structure. The first paragraph, identified as § 1226(c)(1), appears under the heading “Custody.” Like the portion of the earlier enacted detention mandates that contained the “upon completion” or “upon release” clauses, this paragraph sets forth the following custody directive: the Attorney General “shall take into [immigration] custody” an alien who has committed certain offenses or engaged in certain concerning behavior — specified in subparagraphs (A)-(D) of (c)(1) — “when the alien is released, without regard to whether the alien is released on parole, supervised reléase, or probation....”[4]
*21 The second paragraph, identified as § 1226(c)(2), follows directly after (c)(1) and appears under the heading “Release.” Like the portion of the earlier enacted detention mandates that contained the “such felon” clause, this paragraph sets forth the following bar to bonded release from immigration custody: the Attorney General “may release an alien described in paragraph (1) only if’ the alien satisfies certain limited criteria not at issue here.[5]
Under petitioners’ view, (c)(1) and (c)(2) operate in tandem just as the earlier detention mandates did. In consequence of the words “when” and “released” in the first paragraph, the Attorney General must timely take specified aliens coming out of criminal custody into immigration' custody. The second paragraph, by referring to the prior paragraph, then requires the Attorney General not to release on bond the specified aliens that she has timely taken into immigration custody following their release from criminal custody in accordance with the directive in (c)(1).
Petitioners contend that this reading of § 1226(c) makes sense not only as a matter of text, structure, and history, but also on its own terms. Petitioners point to the substantive differences between aliens taken into immigration custody “when ... released” from criminal custody and those aliens who are taken into immigration custody some time after they have been “released” from criminal custody. Petitioners emphasize that “the experience of having one’s liberty stripped away is drastically different from the experience of not having it restored.” See Castañeda v. Souza, 952 F.Supp.2d 307, 318 n. 10 (D.Mass.2013). They also note that their intervening period of freedom makes it possible to take account of their post-release conduct in evaluating the flight risk or danger they may pose.[6] And amici contend that Congress had practical reasons to limit the scope of the mandate in this way, given resource constraints on detention capacity. See Amicus Br. of Frm. Imm. Judges and DHS Sec. Officials at 17-20.
On the basis of this reading of § 1226(c), petitioners contend that the exception to § 1226(a) that (c) carves out does not apply to them due to the remoteness of their release from criminal custody.[7] Accord *22 ingly, petitioners argue they may seek discretionary release on bond under (a) just like any other alien placed in custody by the Attorney General pursuant to that subsection.
The government counters that petitioners’ argument fails at the threshold on the basis of the interpretation of § 1226(c)(2) that the BIA set forth in In re Rojas, 23 I. & N. Dec. 117 (BIA 2001). The BIA held in Rojas that only subparagraphs (A)-(D) of (c)(1) (which enumerate predicate offenses and other qualifying misconduct) limit (c)(2). Rojas thus makes the rest of (c)(1) — including the “when ... released” clause and its trailing language specifying what counts as a “release[ ]” from criminal custody — irrelevant to the application of (c)(2). See Rojas, 23 I. & N. Dec. at 121 (“The ‘when released’ clause is no more a part of the description of an alien who is subject to detention than are the other concluding clauses.” (emphasis in original)).
The government contends we must defer to Rojas’s conclusion that whatever limitations the words “when” and “released” impose on § 1226(c)(1) do not matter for (c)(2) because the text of (c)(2) is not clear on that key point. The government claims we must do so because Rojas reasonably construed (c)(2) to reduce the chance that an alien with an (A)-(D) offense might be released due to a mistaken evaluation of bond risk. The government therefore argues that Rojas requires petitioners’ mandatory detention without bond — notwithstanding their years of living freely — because each petitioner committed an (A)-(D) offense and nothing more is required for (c)(2) to apply.
In the alternative, the government asserts that even if Rojas is wrong and the “when ... released” clause is relevant to (c)(2), the petitioners were in fact taken into immigration custody “when ... released.” The government argues that the word “when” is best read in context to mean “if’ or “any time after.” As a fallback, the government argues that the word “when” at most triggers a duty to act promptly that persists indefinitely. Either way, the government argues, § 1226(c)(2) applies to aliens with predicate offenses who were taken into immigration custody even years after their release from criminal custody.[8]
We consider each argument in turn. We explain first why we conclude that the “when ... released” clause in § 1226(c)(1) also modifies the scope of (c)(2). We then explain why we conclude that the “when ... released” clause imposes a deadline for picking up an alien coming out of criminal custody that limits the application of (c)(2)’s bar to bonded release.[9]
*23 II.
We start with the question whether we must defer to Rojas’s reading of § 1226(c)(2), under which the “when ... released” clause in (c)(1) is wholly irrelevant to the scope of (c)(2). In undertaking this inquiry, we apply the two-step test set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). At step one, we must decide whether Congress spoke clearly to the precise question at issue. Id. at 842, 104 S.Ct. 2778. If so, that ends the matter. Id. at 842-43, 104 S.Ct. 2778. If not, then, at step two, we must defer to the administering agency’s interpretation if it is reasonable. Id. at 843,104 S.Ct. 2778.
Our focus is on step one, which is where we conclude Rojas went wrong.[10] For while Chevron is a famous doctrine, much precedent cautions us not to be so star-struck by it that we must defer to the agency at the first sign of uncertainty about the meaning of the words that Congress chose. Rather, under Chevron, we must be mindful that “a statute may foreclose an agency’s preferred interpretation despite such textual ambiguities if its structure, legislative history, or purpose makes clear what its text leaves opaque.” See Council for Urological Interests v. Burwell, 790 F.3d 212, 221 (D.C.Cir.2015) (quoting Catawba Cnty., N.C. v. E.P.A, 571 F.3d 20, 35 (D.C.Cir.2009)); see also Chemical Manufacturers Ass’n v. N.R.D.C., 470 U.S. 116, 126, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1984) (“We should defer to [the administering agency’s view of the statutory language] unless the legislative history or the purpose and structure of the statute clearly reveal a contrary intent.”).
And that is the case here. In light of both the Act’s structure, see F.D.A. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-34, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (analyzing the words of a statute in view of the “overall statutory scheme” at Chevron step one); Saysana, 590 F.3d at 13-15 (emphasizing the structure of § 1226(c) in declining to defer to the BIA’s interpretation by noting that “the ‘plain meaning’ of a statutory provision is often made clear not only by the words of the statute but by its structure”), and the legislative history, see I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 448-49, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (considering legislative history at step one of *24 the Chevron analysis in declining to defer to Immigration and Naturalization Service (INS) interpretation of statute); Succar v. Ashcroft, 394 F.3d 8, 31 (1st Cir.2005) (“Our view is that where traditional doctrines of statutory interpretation have permitted use of legislative history, its use is permissible and even may be required at stage one of Chevron.”), we conclude that Congress plainly intended for the “when ... released” clause in (c)(1) to apply to (c)(2) as well.
A.
Rojas identified a clear choice between two possible readings of the words in the cross-reference in § 1226(c)(2), “an alien described in paragraph (1).” See Rojas, 23 I. & N. Dec. at 119. Given the text of the cross-reference, the alien to whom (c)(2) refers is either (as Rojas held) an alien who has committed an offense specified in subparagraphs (A)-(D) of (c)(1) or (as petitioners contend) an alien who was taken into custody pursuant to the duty imposed by paragraph (1) as a whole.
This choice matters because it determines whether the “when ... released” clause — and whatever limits it imposes through the words “when” and “released” — modifies the scope of § 1226(c)(2). If “an alien described in paragraph (1)” refers to an alien who was taken into custody pursuant to the duty imposed by (c)(1) as a whole, then the cross-reference would not merely refer to an alien who has committed an (A)-(D) offense. It would instead refer to an alien who has committed an (A)-(D) offense and whom the Attorney General took into immigration custody “when” the alien was “released” from criminal custody, as the “when ... released” clause sets forth the conditions under which that duty applies. Rojas, 23 I. & N. Dec. at 121-22. And (c)(2), then, would come into play as a bar to the release of only those aliens picked up after the duty in (c)(1) had been discharged. See id. at 119 (noting that the cross-reference in (c)(2) could be read to “refer[ ] to an alien who is taken into [immigration custody] ‘when the alien is released’ ”).
In our view, the words “an alien described in paragraph (1)” comfortably support petitioners’ reading. Consistent with the ordinary meaning of the word “described,” § 1226(c)(2) refers to a “mental image, an impression, or an understanding of the nature and characteristics,” see Webster’s Third New International Dictionary 610 (2002), of the alien whom (c)(1) as a whole calls to mind. And thus “an alien described in paragraph (1)” refers to an alien who has committed an enumerated offense and whom the Attorney General has taken into immigration custody “when ... released” from criminal custody. See also The American Heritage Dictionary of the English Language 476 (5th ed.2011) (defining “describe” as “[t]o convey an idea or impression of’ or “[t]o trace the form or outline of’).
No rule of grammar counsels against this reading. Antecedents to cross-references may be found in verbal and adverbial phrases in prior paragraphs not just because (as our colleagues suggest) users of English sometimes use language awkwardly. Antecedents to cross-references may be found in such places because people also use language efficiently.[11]
*25 One thus commits no offense against the English language by saying that the narrator “described in” Frost’s famous poem is the one who “took the road less travelled,” even though the narrator’s first-person account of his past actions in the poem is not east in what our colleagues would consider inherently descriptive terms. And, in fact, Congress has itself relied on the “described in paragraph (1)” formulation to refer not just to the inherently descriptive adjectival portion of the prior paragraph but to the adverbial portion, too. See 28 U.S.C § 1441(e)(l)-(2) (in referring to an “action described in paragraph (1),” Congress clearly intended to capture the trailing adverbial portion of paragraph (1), which states that the “entire action may be removed if the action would [otherwise] be removable ”).
The petitioners’ reading finds additional support in the fact that the text of the cross-reference does not expressly state, as one might have expected if Rojas were right, that the only part of § 1226(c)(1) that is relevant to (c)(2) is the part that denominates the (A)-(D) offenses.[12] Rather than straightforwardly refer to “an alien described in subparagraphs (A)-(D),” Congress instead expressly referred to “an alien described in paragraph (1),” even though Congress singled out similar offenses to those set forth in (A)-(D) in the parallel detention mandate set forth elsewhere in the IIRIRA. See IIRIRA § 303(b)(3), 110 Stat. 3009587 (“The Attorney General may release the alien only if the alien is an alien described in subpara-graph (A)(ii) or (A)(iii)” (emphasis added)).
Nevertheless, we agree that, standing alone, the words “an alien described in paragraph (1)” could be read as Rojas reads them. As a textual matter, the “described in” language in the cross-reference could be read to refer the reader only to subparagraphs (A)-(D) of paragraph (1), as they plainly do describe the alien in (c)(1). One could thus read this cross-reference as directing the reader to identify the alien whom (c)(1) itself refers to in characteristically descriptive terms, rather than directing the reader to identify the alien whom (c)(1) as a whole calls to mind.[13]
*26 To determine if Congress chose between the two possible antecedents to the cross-reference in § 1226(c)(2), we thus must do what Rojas did: look beyond the words of the cross-reference. See Rojas, 23 I. & N. Dec. at 121-24 (reviewing the structure of the act in which § 1226 appears and its legislative history, as well as the predecessor provisions to § 1226). And it makes particular sense to do so here, as there is good reason to question whether Congress would have intended to leave the precise issue unresolved. To find that Congress did not intend to choose an antecedent, one would have to believe Congress was content to let the very executive branch officials that it did not trust to make certain detention decisions determine the extent of that distrust through their choice between the two possible antecedents. See American Bar Ass’n v. F.T.C., 430 F.3d 457, 469 (D.C.Cir.2005) (noting that “the sort of ambiguity giving rise to Chevron deference is a creature not of definitional possibilities, but of statutory context” and declining to defer to an agency’s interpretation given the sort of ambiguity at issue (quotation marks and citation omitted)). Accordingly, before we conclude that Congress did not speak to this issue, we need to consider the relevant words in context, as is required under Chevron step one.
B.
A key part of that context is the structure of the IIRIRA as a whole, as we are obliged to construe § 1226(c) in light of the whole act in which that provision appears. See Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 484, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The structure of that act, however, is hard to square with Rojas. And thus the structure of the IIRIRA supports the conclusion that Congress chose to refer to an alien “described in paragraph (1)” rather than more specifically to an alien “described in subparagraphs (A)-(D)” because Congress intended to refer to an alien called to mind by the paragraph as a whole.
We start first with the structure of § 1226, which is oddly misaligned unless we look beyond subparagraphs (A)-(D) of (c)(1) to the “when ... released” clause to identify the alien to whom (c)(2) refers. Cf. Whitman, 531 U.S. at 484-86, 121 S.Ct. 903 (declining to defer to an agency’s interpretation under Chevron where such interpretation was “so at odds with [the statute’s] structure,” in that it rendered certain parts of a carefully delimited exception to the agency’s otherwise broad discretion “nugatory”). The misalignment arises because Rojas necessarily reads the cross-reference to de-link the “Custody” directive in § 1226(c)(1) from the bar to “Release” in (c)(2).
Rojas has this effect because, for example, as the government has previously informed us, “there are a variety of offenses for which an alien may be ... subject to mandatory detention under [§ 1226(c)(1)(A) ], but that may never give rise to a formal charge, let alone an indictment, trial or conviction.” See Saysana, 590 F.3d at 14 (quotation marks omitted) (restating the government’s argument).[14] *27 In consequence, some aliens who fall within subparagraphs (A)-(D) will not be subject to (c)(1) because they will never have even been “released” from criminal custody as the “when ... released” clause requires. See Rojas, 23 I. & N. Dec. at 122.[15] According to Rojas, however, such aliens — if taken into custody pursuant to § 1226(a) — would still be subject to the bar to bonded release that (c)(2) establishes.
Rojas necessarily would apply the bar to bonded release to such aliens because Rojas makes an alien’s “release” from criminal custody irrelevant to the application of § 1226(c)(2). After all, it is the “when ... released” clause and not subparagraphs (A)-(D) that ensures that an alien taken into custody pursuant to (c)(1) is an alien who has been “released” from criminal custody. Thus, Rojas incongruously (and without even acknowledging the incongruity) requires one to believe that Congress was so concerned about certain aliens who had never been in criminal custody, as the “when ... released” clause contemplates, being out and about that it directed the Attorney General to hold them without bond even though Congress left her complete discretion to decide not to take them into immigration custody at all.[16]
Petitioners’ reading avoids this oddly half-hearted understanding of the detention mandate. Petitioners read the release-from-criminal-custody constraint that appears outside subparagraphs (A)-(D) and in the “when ... released” clause to limit both the “Custody” and “Release” aspects of the detention mandate. Under this more natural reading, § 1226 as a whole coheres quite well. Pursuant to § 1226(a), the Attorney General would have the discretion to release on bond those aliens she had the discretion not .to take into custody. And, pursuant to § 1226(c), the Attorney General would be mandated to keep in custody only those she was mandated to take into custody.[17] *28 See Saysana, 590 F.3d at 9, 13-16 (analyzing the meaning of the “when ... released” clause and its trailing language in (c)(1) in order to determine whether an alien was properly held without bond under (c)(2)). In this way, Congress would have crafted a detention mandate that, from start to finish, covers the same class of aliens (whatever the word “when” might mean) that it had identified as a cause for concern.[18]
Two other parts of the IIRIRA lend further support to petitioners’ reading of the cross-reference, in which the “when ... released” clause in (c)(1) applies as a constraint across the whole of (c). These parts of the IIRIRA are set forth in the Transition Period Custody Rules (TPCR). These rules apply instead of § 1226(c) for a one- or two-year transition period, but only if they are invoked by the Attorney General. IIRIRA § 303(b)(2), Pub.L. No. 104-208, 110 Stat. at 3009-586.
The first instructive part lies in the TPCR’s parallel detention mandate. The TPCR’s mandate shares the same structure as § 1226(c).[19] And, notably, like § 1226(c), the predicate offenses that trigger the custody directive in the TPCR do not require an alien to have been “released” from criminal custody. See Matter of Garvin-Noble, 21 I. & N. Dec. 672, 680-81 (BIA 1997). The TPCR’s mandate thus presents the same interpretive question that § 1226(c) presents as to whether the “when ... released” clause — and thus its *29 release-from-criminal-custody constraint— in that mandate’s custody directive limits that mandate’s follow — on bar to bonded release. And because this mandate presents the same interpretive question, it also presents the same potential structural misalignment.[20]
Tellingly, the TPCR presents its custody directive (including its “when ... released” clause) under the heading “In General” and the bar to bonded release under the subsequent heading, “Release.” This presentation indicates that the “when ... released” clause constrains both the custody directive and the bar to bonded release, such that the bar applies to the very people encompassed by the “General” directive, rather than to some people who were not encompassed by that directive at all because they were never “released” from criminal custody.
The second instructive part of the IIRI-RA lies in section 303(b)(2), Pub.L. No. 104-208, 110 Stat. at 3009-586. This TPCR provision mediates the shift from the transition rules to the permanent regime. The provision clearly provides that § 1226(c) as a whole — both with respect to its custody directive and its bar to bonded release — applies only to aliens “released after” the TPCR expires. And the BIA has rightly read this “released after” clause to mean that an alien must have been “released” from criminal custody to be subject to § 1226(c) going forward. See In re Adeniji, 22 I. & N. Dec. 1102, 1108-11 (BIA 1999). This clause thus ensures that a release-from-criminal-custody constraint does now limit the scope of both (c)(1) and (c)(2).
If we applied Rojas’s analysis of (c)(2) to the TPCR’s equivalent to (c)(2), however, no such “released” constraint would limit the scope of that portion of the TPCR’s detention mandate because the “when ... released” clause in its custody directive would not apply to the mandate as a whole. Under Rojas, therefore, the “released after” clause would — in this key respect— make the permanent mandate’s bar to bonded release less sweeping than the supposedly more flexible TPCR mandate’s bar had been, even though Congress clearly intended the latter to be less encompassing.[21] No such anomalous narrowing of the detention mandate would occur upon the expiration of the TPCR if, by contrast, the “when ... released” clause limits the bar to bonded release that appears in both the transition and the permanent rules.[22]
*30 For these reasons, the structure of the IIRIRA as a whole strongly indicates that Congress did intend for the cross-reference in § 1226(c)(2) to reach beyond sub-paragraphs (A)-(D) to the “when ... released” clause and thus to refer to an alien taken into custody pursuant to the duty imposed by (c)(1) as a whole.[23] And thus the IIRIRA’s structure indicates that Congress referred to paragraph (1) rather than more specifically to the subparagraphs within it because Congress intended to link the “Custody” and “Release” aspects of the detention mandate so that they would work together. Before we conclude that Congress dearly chose the broader antecedent to “an alien described in paragraph (1),” however, we must still “exhaust the traditional tools of statutory construction.” See Sierra Club v. EPA, 551 F.3d 1019, 1027 (D.C.Cir.2008). And so we now turn to the legislative history.
C.
The legislative history confirms that Congress intended the cross-reference in § 1226(c)(2) to refer to an alien taken into custody pursuant to the duty imposed by (c)(1) as a whole rather than only to an alien described in subparagraphs (A)-(D). And thus the legislative history helps to make clear that the “when ... released” clause — and whatever limitations it imposes — applies across the whole of (c). This conclusion follows from the legislative history directly tied to the IIRIRA and from the many precursors to § 1226(c). The text and history of those precursors show that Congress intended for those versions of the detention mandate to operate in just the linked manner that Rojas rejects in construing (c), and the evidence also indicates that Congress did not mean to alter this aspect of the longstanding scheme in passing the IIRIRA. Milner v. Dep’t of Navy, 562 U.S. 562, 572, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011) (“Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text.”); see also Goldings v. Winn, 383 F.3d 17, 21 (1st Cir.2004) (“[I]f the statute’s legislative history reveals an unequivocal answer as to the statute’s meaning, we do not look to the [agency’s] interpretation.... ”).
1.
The title to § 1226(c) — encompassing both (c)(l)’s “Custody” directive and (c)(2)’s “Release” bar — is “Detention of Criminal Aliens.” The conference report to the IIRIRA follows the language of that overarching title in describing in unqualified terms the “subsection” as providing that the Attorney General “must detain” *31 certain aliens. The report then sets forth one qualification to that requirement in the next sentence and another qualification in the third sentence, stating that “[t]his detention mandate applies whenever such an alien is released from imprisonment, regardless of the circumstances of the release.” H.R. Conf. Rep. No. 104-828 (1996), 1996 WL 563320, at *210-11. And finally, the report states that “[t]his subsection also provides” for the “release!]” of aliens “from the Attorney General’s custody” in one limited circumstance. See id. In keeping with the title to § 1226(c), we thus understand the use of the phrase “[t]his detention mandate” to refer to a start-to-finish detention regime that is limited across-the-board by the “when ... released” clause. See Rojas, 23 I. & N. Dec. at 119, 122-23 (describing the “mandatory detention aspects of the statute” as arising from both the bar to bonded release and the custody directive). After all, the report expressly attributes the mandate to the “subsection” it describes rather than to only part of it.
But even if, as our colleagues contend, the report’s reference to “[t]his detention mandate” is only to the differently worded and more limited duty to “take into custody” certain aliens set forth only in § 1226(c)(1), see infra at 49-50, the report would then merely restate the question that we must decide: whether Congress intended for the bar to bonded release set forth in (c)(2) to incorporate the conditions that plainly limit the application of the custody directive in (c)(1).[24] If so, the remaining legislative history that actually concerns the relationship between the custody and release aspects of the detention mandate convinces us that Congress clearly did so intend, when this history is read against the strong structural reasons to conclude that Congress chose to refer in (c)(2) to “paragraph (1)” rather than sub-paragraphs (A)-(D) in order to encompass the same aliens under both (c)(1) and (c)(2).
Just prior to conference, a leading Senate sponsor of the IIRIRA described the bill as “ensuring] that aliens who commit serious crimes are detained upon their release from prison until they can be deported----” 142 Cong. Rec. S10572-01 (daily ed. Sept. 16, 1996), 1996 WL 522794 (statement of Sen. Simpson) (emphasis added). And it should be no surprise that Senator Simpson described the bill this way. Congress stated in a key report right before conference that the new measure was intended to “restate! ]” the provisions of the old statute “regarding the detention of an alien convicted of an aggravated felony____” See H.R. Rep. 104-469(1) (1996), 1996 WL 168955, at *230. And, as we next explain, each prior version of the detention mandate (including the immediate precursor to the IIRIRA) similarly treated the two analogous directives to the ones that subsection (c) contains as operating in tandem.

*32
2.

The text and legislative history to the precursors to § 1226(c) clearly show that Congress intended to link the custody directive and the bar to bonded release in these prior detention mandates in just the way that Rojas rejects in construing § 1226(c). And interpreters of those precursors — including both the BIA and the district courts — so read them.
We start with the 1988 mandatory detention statute, which provided: “The Attorney General shall take into custody any alien convicted of an aggravated felony upon completion of the alien’s sentence for such conviction. Notwithstanding subsection (a) [the then-equivalent of § 1226(a) ], the Attorney General shall not release such felon from custody.” Anti-Drug Abuse Act of 1988, § 7348(a), Pub.L. No. 100-690, 102 Stat. 4470. The text is most naturally read as limiting the bar to bonded release to the “felons” whom the Attorney General was required to “take into custody.” And not long after its enactment, the BIA read the provision just that way, by treating the “upon completion” clause (the then-equivalent of the “when ... released” clause) in the 1988 mandate’s custody directive as if it conditioned that mandate’s “such felon” clause (the then-equivalent of “an alien described in paragraph (1)”) in the follow-on bar to bonded release from immigration custody. Matter of Eden, 20 I. & N. Dec. 209, 211 (BIA 1990).[25]
The 1990 amendments to the 1988 statute then codified Eden, which was decided months earlier, and the House report to the amendments espoused that same view of the relationship between the two clauses. That report characterized “current law” (that is, the detention mandate set forth in the 1988 statute) as “requirfing] [the government] to incarcerate alien aggravated felons without bond immediately upon completion of the alien’s criminal ‘sentence.’ ” H.R.Rep. No. 101-681(I), § 1503, at 148 (1990) (emphasis added); cf. United States v. Bd. of Comm’rs of Sheffield, Ala., 435 U.S. 110, 129-35, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978).
Moreover, in codifying Eden, Congress modified the then-equivalent of § 1226(c)(1) in order to clarify the scope of *33 the then-equivalent of (c)(2). Congress did so by making clear that aliens were “released” from criminal custody and thus could be held without bond at the moment they were released from incarceration, even though they might still be on parole or supervised release.[26] In revising the “upon completion” clause, Congress necessarily treated the then-equivalent of the “when ... released” clause and its trailing language as limiting the follow-on bar to bonded release. Otherwise, Congress would have had no need to tinker with that language at all in light of the discretion to place aliens in immigration custody that the Attorney General otherwise had. And, by passing the amendments, Congress necessarily retained (albeit in revised form) that limitation on the operation of both the custody directive and the bar to bonded release.[27]
Finally, in 1996, not long before the IIRIRA’s enactment, Congress further amended the mandatory detention statute while again retaining the same structure, which again naturally reads as if those barred from release are those that must be picked up. See AEDPA, § 440(c), Pub.L. No. 104-132, 110 Stat. 1214, 1277 (retaining “upon release”/“such felon” structure). And prior to the passage of § 1226(c), district courts not surprisingly treated the retained “upon release” clause as if it conditioned the retained “such felon” clause, just as the BIA and Congress itself had treated the analogous clauses in prior detention mandates.[28]
*34 We generally “assume that Congress is aware of existing law when it passes legislation,” see Miles v. Apex, 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), so we should assume that Congress understood the prevailing interpretation of the relationship between the custody directive and the bar to bonded release to be a linked one. After all, courts were consistently interpreting that relationship postAEDPA in the same way Congress and the BIA had interpreted that relationship in the similarly worded clauses pre-AEDPA.[29] And while Congress broadened the cross-reference in the present detention mandate to account for the fact that not all aliens subject to the present mandate qualify as “felons,” we do not think Congress thereby intended to alter fundamentally the relationship between the custody directive and the bar to bonded release. In fact, the evidence is to the contrary. See H.R. Rep. 104-469(1) (1996), 1996 WL 168955, at *230 (stating that § 1226(c) was intended to “restate[]” the provisions of the immediately preceding detention mandate codified in the AEDPA).
3.
In countering the substantial evidence from the legislative history that points against Rojas, the government and our colleagues give great weight to an April 1995 report from the Senate Committee on Governmental Affairs. See S.Rep. No. 104-48 (1995), 1995 WL 170285. The Supreme Court relied on that report in De-more v. Kim, 538 U.S. 510, 518-22, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), to explain why Congress could have had a reason for mandating the detention without bond of criminal aliens in order to respond to the contention that such mandatory detention was inherently arbitrary. In ad *35 dressing that constitutional challenge to Congress’s power to enact a detention mandate of any scope, the Supreme Court did not purport to enlist that report to describe the class of aliens subject to the mandate § 1226(c) actually imposed. And for good reason.
That 1995 report was not linked to any particular bill. And that report predates not only § 1226(c) but also the immediate precursor to (c), which used the same “upon”/“such felon” language that tracked the 1988 mandate and its revisions that we have just described. The 1995 Senate report cannot offer any support, therefore, for the suggestion that the present detention mandate must have de-linked the custody directive and bar to bonded release that had been linked in those prior versions.
And, in fact, the report does not speak to that issue at all. To be sure, that report does show that its authors were “concerned with detaining and removing all criminal aliens,” Rojas, 23 I. & N. Dec. at 122 (emphasis in original); see also Sylvain v. Attorney Gen. of U.S., 714 F.3d 150, 160 (3d Cir.2013). But in stating that general concern, the report does not demonstrate that Congress intended to paint with the broad brush the government suggests that it used in enacting § 1226(c)(2). See Saysana, 590 F.3d at 16-18 (“The mandatory detention provision does not reflect a general policy in favor of detention. ...”).
The report does also suggest a variety of ways to address the concern that “criminal aliens” (i.e., aliens with deportable offenses) do not show up to removal proceedings. These suggestions range from increasing detention bed space to accommodate enhanced detention efforts generally, to expediting the removal process so that final adjudication occurs while an alien is still in criminal custody, to expanding the role of mandatory detention (§ 1226(c)) in relation to discretionary detention (§ 1226(a)) by subjecting all criminal aliens to (c). See S.Rep. No. 104-48 (1995), 1995 WL 170285, at *3-4, *21, *23, *31-32. The report nowhere indicates, however, that Congress wanted to expand the role of mandatory detention haphazardly by de-linking (c)(1) and (c)(2), such that the bar to bonded release would apply to persons who were not even subject to the custody directive at all because they had never been in the criminal custody from which they were then “released” as (c)(1) contemplates. See generally id.[30]
*36 4.
In sum, Rojas offers only one reason for concluding that these petitioners may not be given a bond hearing and that reason has nothing to with what the word “when” means. On Rojas’s view, § 1226(c)(2) applies to any alien who has committed an (A)-(D) offense, regardless of whether the alien was ever in and “released” from criminal custody as (c)(1) requires, let alone “when” the alien was released from it. And that is because Rojas holds that the “when ... released” clause as a whole is irrelevant to (c)(2). But when we consider the text of (c)(2) in light of the structure of the IIRIRA as a whole and the legislative history, we do not believe that Rojas offers a tenable construction of the detention mandate.
After applying the traditional tools of statutory interpretation, we conclude that Congress did clearly speak to the precise issue Rojas addressed regarding the relevance of the “when ... released” clause to the bar to bonded release in § 1226(c)(2). And Congress clearly addressed it in the opposite way from Rojas. That is, Congress clearly intended for the cross-reference in (c)(2) to refer to aliens who have committed (A)-(D) offenses and who have been taken into immigration custody “when ... released” from criminal custody, in accordance with the Attorney General’s duty under (c)(1).
In concluding that Rojas does warrant deference, our colleagues repeatedly emphasize that it is reasonable to conclude that the timeliness of an alien’s immigration custody is not determinative of whether the detention mandate applies. But it is important not to confuse the outcome that results from Rojas’s interpretation of the mandate’s scope with the interpretation itself.
For while it is true that Rojas’s conclusion that the “when ... released” clause as a whole is irrelevant to § 1226(c)(2) necessarily makes timeliness irrelevant to the operation of (c)(2), Chevron is clear that it is the agency’s interpretation of the statute and not the outcome that follows from that interpretation that deserves our deference. See Lin v. U.S. Dep’t of Justice, 416 F.3d 184, 191-92 (2d Cir.2005) (declining to defer to BIA’s summary affirmance of an immigration judge decision because summary affirmance indicates approval of only “the result reached in the decision” rather than “all of the reasoning of that decision” and thus does not contain “the sort of authoritative and considered statutory construction that Chevron deference was designed to hon- or”). And that must be the case, as the reason we defer to agency interpretations is precisely because we are supposed to give weight to their reasoned judgment.
For Chevron purposes, therefore, the contention that the legislative history or the structure of the IIRIRA does not compel the timing-based outcome that the petitioners favor amounts to a non sequitur. What matters is that Rojas implausibly ascribes an intention to Congress to place greater limits on the Attorney General’s discretion to take aliens into custody in the first place than on the Attorney General’s discretion to release them once they are in custody. And so, having determined under Chevron step one that Rojas’s interpretation of the relationship between (c)(1) and (c)(2) conflicts with Congress’s evident intent and thus does not merit deference, we now turn to the question that remains: the meaning of (c)(l)’s “when ... released” clause.
III.
In taking up this issue, we confront the question that Rojas never reaches: does “when” impose a time limit for taking *37 an alien into custody pursuant to (c)(1) that renders (e)(2)’s bar to bonded release inapplicable to these petitioners due to the remoteness of their release from criminal custody? See Sylvain, 714 F.3d at 157 n. 9 (stating that Rojas “did not explicitly interpret” the word “when”).
The government argues that the word “when” imposes no such time limit, either because “when” means “if’ or “any time after” or because Congress at most used the word “when” to trigger a duty to act promptly that persists indefinitely. The BIA, however, has never adopted either view, and such litigating positions are not entitled to Chevron deference.[31] See United States v. Mead Corp., 533 U.S. 218, 231, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). We thus must decide the clause’s meaning on our own. See Santana v. Holder, 731 F.3d 50, 53 (1st Cir.2013).
To do so, we first consider whether the word “when” as used here is- merely a synonym for “if’ or “any time after” and consequently conveys no sense of immediacy at all. We then consider whether, even if Congress intended for the word “when” to convey immediacy, the word merely reflects a legislative preference for timely action and thus does not impose a true time limit.
A.
We begin our analysis of the first issue with the observation that Congress chose a word, “when,” that naturally conveys some degree of immediacy, Castañeda, 769 F.3d at 42-44, as opposed to a purely conditional word, such as “if.” See Webster’s Third New International Dictionary 2602 (2002) (defining “when” as “just after the moment that”). Consistent with the conclusion that this choice indicates that Congress intended for “when” to convey immediacy, § 1226(c)(1) says “when the alien is released,” not “when the alien has been released” or “after the alien is released.” Similarly, the structural placement of the “when ... released” clause suggests Congress did not use “when” simply to announce a condition, as the clause does not directly follow “any alien who.” Cf. Rojas, 23 I. & N. Dec. at 128-29.[32]
*38 If Congress really meant for the duty in (c)(1) to take effect “in the event of’ or “any time after” an alien’s release from criminal custody, we would expect Congress to have said so, given that it spoke with just such directness elsewhere in the IIRIRA. See, e.g., 8 U.S.C. § 1231(a)(5) (“[T]he alien shall be removed under the prior order at any time after the reentry.” (emphasis added)); cf. United States v. Willings, 8 U.S. (4 Cranch) 48, 54, 2 L.Ed. 546 (1807) (concluding that Congress intended the word “when” in a federal maritime statute to mean “if’ or “in case” because the statute contained clear indicia of conditional intent (for example, the phrase “in every such case” recurred)). In fact, the BIA itself noted in Rojas that “[§ 1226(c) ] does direct the Attorney General to take custody of aliens immediately upon their release from criminal confinement.” Rojas, 23 I. & N. Dec. at 122 (emphasis added).
As to just how promptly Congress intended for the government to act, there is more uncertainty, as the panel recognized when it construed the word “when” to mean “within a reasonable time after.” See Castañeda, 769 F.3d at 44. But given the unexplained, years-long gap between when these petitioners were released from criminal custody and when they were taken into immigration custody, we need not define the bounds of reasonableness in this case as they were plainly exceeded.[33] Thus, for present purposes, it is enough to conclude that Congress used the word “when” to convey some degree of immediacy and not simply to set forth a condition.[34]
*39 B.
The part of the conference report to the IIRIRA that describes § 1226(c) supports the conclusion that Congress did not intend for the word “when” to have a purely conditional meaning. And so, too, does the legislative history to (c) that indicates it was meant to mirror the precursor mandates, each of which used a timing word that was understood to convey immediacy.
The conference report states that “[tjhis detention mandate applies whenever such an alien is released from imprisonment, regardless of the circumstances of the release.” H.R. Conf. Rep. No. 104-828 (1996), 1996 WL 563320, at *210-11 (emphasis added). As used in that report, “whenever” is most plausibly read to mean at the time that the alien is released from imprisonment, whenever that event may occur, rather than simply “if’ that event occurs. Indeed, had Congress intended by the use of “whenever” to mean “if’ or “any • time after,” we again would expect the report to have said “after such alien is released” or “whenever such an alien has been released.”
Consistent with this conclusion, the legislative history to the subsection that would become § 1226(c) indicates that Congress intended to “restate! ]” the provisions of the direct precursor to (c) “regarding the detention of an alien.” See H.R.Rep. No. 104-469(1) (1996), 1996 WL 168955, at *230. And that direct precursor, which is codified in the AEDPA, used the word “upon,” which was used in and understood to have conveyed immediacy in all the detention mandates preceding § 1226(c).[35]
For example, the House Report on the 1990 amendments to the 1988 mandatory detention statute characterized “current law” as “requir[ing] [the] INS to incarcerate alien aggravated felons without bond immediately upon completion of the alien’s criminal ‘sentence.’” H.R.Rep. No. 101-681(1), § 1503, at 148 (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6554,1990 WL 188857 (emphasis added); cf. Sheffield, 435 U.S. at 129-35, 98 S.Ct. 965. And the district courts that construed the word “upon” in the AEDPA’s detention mandate reached the same conclusion as Congress had about the 1988 measure — its use of the word “upon” conveyed immediacy. See, e.g., DeMelo, 936 F.Supp. 30, 36 (D.Mass. 1996), vacated as moot after the IIRIRA’s passage, 108 F.3d 328 (1st Cir.1997).
In sum, the legislative history as a whole indicates that Congress used the word “when” just as it had used the word “upon”: to convey a sense of immediacy. We thus conclude that the legislative history reinforces the textual indication that Congress did not intend for the word “when” to be merely a synonym for “if’ or “any time after.”
*40 C.
That brings us to the question of whether Congress intended for the word “when” merely to express a legislative preference for timely action or whether it was instead intended to impose a deadline for the application of the bar to bonded release set forth in § 1226(c). To answer this question, we consult the principles underlying the so-called loss-of-authority canon.[36]
That interpretive aid comes into play where Congress has mandated that the government “shall” do something within a certain time frame and there is a question about the consequence Congress intends for the government’s failure to complete the required action within that time frame. See Barnhart v. Peabody Coal Co., 537 U.S. 149, 158-59, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003). The canon generally counsels that: “[i]f a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction.” Id. at 159, 123 S.Ct. 748. The animating principle behind this canon is one of plausibility given the context: “if Congress had meant to set a counterintui-tive limit on authority to act, it would have said more than it did.” Id. at 163, 123 S.Ct. 748 (emphasis added).
The government contends that § 1226(c) “contains no sanction for late executive action,” Gov. Br. at 10, and that it would be counterintuitive to render (c) inapplicable when the executive is late in taking an alien into custody given the detention-maximizing purpose underlying (c). But we do not agree.
This case is not like those in which enforcement of a time limit would require a court to fashion a coercive sanction that appears nowhere in the text and that would completely strip the government of authority “to get [the] ... job done,” id. at 160, 123 S.Ct. 748. See, e.g, id. at 156, 123 S.Ct. 748 (proposed sanction was complete loss of ability to direct award of retirement benefits to late-assigned beneficiaries); Brock v. Pierce Cty., 476 U.S. 253, 258, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (proposed sanction was complete loss of ability to recover misused federal funds); Dolan *41 v. United States, 560 U.S. 605, 609, 130 S.Ct. 2533, 177 L.Ed.2d 108 (2010) (proposed sanction was complete loss of ability to order persons convicted of certain crimes to pay restitution to victims). Rather, the putative time limit at issue here appears in an express exception, § 1226(c), to an otherwise broad grant of discretionary authority, § 1226(a), regarding the custody and release of aliens awaiting the outcome of removal proceedings, just as all the precursors to § 1226(c) were framed as exceptions to then-equivalents of § 1226(a). Thus, enforcement of the time limit here, unlike in the other cases in which loss-of-authority principles were applied, would merely render inapplicable an express limit on a grant of authority and thus necessarily result in a reversion to that authority.
Given this distinct context, the key question is whether Congress intended for the requirement that the Attornéy General timely take aliens into immigration custody to circumscribe the scope of this exception. As a textual matter, there is no indication that Congress intended for sub-paragraphs (A)-(D) in § 1226(c)(1) but not the “when ... released” clause to define the outer limit of the Attorney General’s discretion that the exception in (c) establishes. The text of (c) also does not itself indicate that the timeliness of an alien’s custody is merely a procedural requirement that need not be complied with in a strict sense. -
There remains the question .whether it nevertheless would be counterintuitive to read “when” to circumscribe the exception’s scope. The express presentation of § 1226(c) as an exception to (a) that applies only if all of its conditions are met accords with the quite sensible intuition that Congress did mean to distinguish between aliens who fall .within the scope of (a) and aliens who fall within the scope of (c) on the basis of the timeliness of their immigration custody.[37] In construing the intended scope of another aspect of § 1226(c), we explained in Saysana that “[i]t is counter-intuitive to say the least to say that aliens with potentially longstanding community ties are, as a class, poor bail risks.” See Saysana, 590 F.3d at 17. And we added that “by any logic, it stands to reason that the more remote in time a conviction becomes and the more time after a conviction an individual spends in a community the lower his bail risk is likely to be.” See id. at 17-18.[38]
Thus, in this context, we conclude that the timing word “when” is best read *42 to impose an outer limit on the exception to the categorical bar to discretionary release carved out by § 1226(c). In consequence, aliens like petitioners, who due to the unexplained years-long gap between their criminal custody and their immigration custody have had the opportunity to re-establish community ties, are not subject to the bar to release set forth in (c). They are subject instead to the default rule of discretionary release set forth in (a).[39]
To be sure, Congress was concerned about criminal aliens failing to show up for removal proceedings. See Rojas, 23 I. & N. Dec. at 122. But Congress expressly directed the executive to address that concern by complying with the mandate to pick up aliens within a reasonable time frame. In fact, Congress established transition rules that the Attorney General could invoke to ensure the government would be prepared to comply promptly with § 1226(c) by the time those rules expired. See Adeniji, 22 I. & N. Dec. at 1110.
As a result, we do not believe Congress intended that the executive could fail to pick up an alien within a reasonable time and then, despite that unexplained delay, deny that alien the chance to seek bonded release notwithstanding that alien’s years of living freely. See Castañeda, 952 F.Supp.2d at 318 n. 10 (“[T]he experience of having one’s liberty stripped away is drastically different from the experience of not having it restored.”); cf. DeWitt v. Ventetoulo, 6 F.3d 32, 34-36 (1st Cir.1993) (holding that revoking a mistakenly granted suspension of sentence and re-imprisoning a defendant after years of being free violated due process). And there certainly is nothing in the legislative history to indicate that Congress did have that specific intention.[40]
For these reasons, the principal precedent that the government, like the Third Circuit in Sylvain, 714 F.3d at 158-61, relies on, United States v. Montalvo-Mu-rillo, 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990), is not to the contrary. That case concerned whether the government’s failure to hold a bond hearing in a timely fashion barred the government from assuming pre-trial custody of a criminal defendant under the Bail Reform Act (BRA). See Montalvo-Murillo, 495 U.S. at 717, 110 S.Ct. 2072. Notably, but not surprisingly, the BRA specified no consequence for holding a hearing late. And *43 the Court thus held that such failure should not be deemed to have the drastic and disproportionate consequence of depriving the government of its power to place a criminal defendant in custody at all by mandating the release of the criminal defendant. See id. at 719-20, 110 S.Ct. 2072.[41]
Here, however, the putative time limit appears within an express exception to a grant of authority. So § 1226 itself makes clear what consequence would follow if such time limit is not met. Moreover, that consequence would not strip the executive of the power to assume custody of a potentially dangerous or flight-prone criminal defendant. Instead, the Attorney General would merely retain her otherwise broad discretion to decide whether to assume and maintain custody of an alien pursuant to whatever rules she may lawfully establish for exercising such discretion under (a). Because this consequence follows from the text and because the text accords with the reasonable and intuitive understanding that Congress intended to distinguish between aliens like petitioners and aliens who were taken into custody “when ... released,” see Saysana, 590 F.3d at 17, we read the timing condition at issue here as circumscribing the Attorney General’s duty under (c).
Thus, at least absent an authoritative agency construction of § 1226(c)(2), we conclude that the word “when” does set forth a time constraint on (c) that expires after a reasonable time. And for that reason, we reject the government’s contention that “when” must be read merely to trigger an indefinitely persisting duty, such that it imposes no outer bound on the scope of the exception § 1226(c) sets forth.
IV.
The current version of the detention mandate requires that aliens who have committed certain offenses be taken into immigration custody in a timely manner following their release from criminal custody. The detention mandate further provides that only such aliens must then be held without bond until the completion of the removal process. These petitioners were released from criminal custody years before they were first placed in immigration custody. For that reason, they clearly do not fall within “this detention mandate.” H.R. Conf. Rep. No. 104-828 (1996), 1996 WL 563320, at *210-11. Accordingly, we agree with the two district courts that these petitioners have the right to individualized bond hearings at which they can make the case that they do not pose sufficient bond risks, just as the Attorney General specified in the regulations that she issued pursuant to § 1226(a).

. This authorization, located in 8 U.S.C. § 1226(a), provides: “On a warrant issued by the Attorney General, an aben may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General ... may continue to detain the arrested alien ... and ... may release the alien on ... bond....”

. Although the Attorney General now shares responsibilities under § 1226(a) with the Secretary of Homeland Security and the Under Secretary for Border and Transportation Security, see Homeland Security Act of 2002, Pub.L. No. 107-296, §§ 402, 441, 116 Stat. 2135, we will for convenience refer to this authority as being vested in the Attorney General.

. Section 1226(c) provides:
(c) Detention of criminal aliens
(1) Custody
The Attorney General shall take into custody any alien who—
(A) is inadmissible by reason of having committed any offense covered in [8 U.S.C. § 1182(a)(2)],
(B) is deportable by reason of having committed any offense covered in [8 U.S.C. § 1227(a)(2)(A)(ii)-(iii),(B)-(D)],
(C) is deportable under [8 U.S.C. § 1227(a)(2)(A)(i)] on the basis of an offense for which the alien has been sentence [sic] to a term of imprisonment of at least 1 year, or
(D) is inadmissible under [8 U.S.C. § 1182(a)(3)(B)] or deportable under [8 U.S.C. § 1227(a)(4)(B)],
when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.
(2) Release
The Attorney General may release an alien described in paragraph (1) only if ... release of the alien from custody is necessary to provide protection to a witness....

. As these petitioners were released from prison sentences, there is no question they were "released” within the meaning of § 1226(c)(1). With respect to the precise requirement the word "released” imposes, the Second Circuit recently held in Lora v. Shana-han that a convicted alien who receives a non-carceral sentence has also been "released.” Lora v. Shanahan, 804 F.3d 601, 609-10 (2d Cir.2015). The Second Circuit concluded that this interpretation of "re *21 leased” "avoids nullifying” the trailing language in (c)(1), which, through its reference to "probation," "clearly contemplates non-carceral sentences.” Id. In effect, the Second Circuit interprets "released” to mean "release from the technical custody of the criminal court” (i.e., at the end of the sentencing proceeding), a position that the government has elsewhere advanced. See In re West, 22 I. & N. Dec. 1405, 1408 (BIA 2000). In so doing, the Second Circuit did not address the BIA's view that "released” means even release from pre-conviction arrest. See In re Kotliar, 24 I. & N. Dec. 124, 125 (BIA 2007); West, 22 I. & N. Dec. at 1410; see also Saysana v. Gillen, 590 F.3d 7, 14 (1st Cir.2009) (suggesting, more broadly, that an alien could be arrested and not convicted and yet still fall within § 1226).

.Aliens taken into custody pursuant to § 1226(c) are entitled to a "Joseph " hearing at which the alien "may avoid mandatory detention by demonstrating that he is not an alien, was not convicted of the predicate crime, or that [U.S. Immigration and Customs Enforcement] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention.” Demore v. Kim, 538 U.S. 510, 514 n. 3, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003).

. For example, since his release from criminal custody in 2008, petitioner Clayton Gordon has become a father, bought a house, developed a successful business, and worked on a project to open up a halfway house for women. Castañeda, 769 F.3d at 40.

. Leiticia Castaneda, a native of Brazil, was arrested in Massachusetts for misdemeanor possession of cocaine, sentenced to probation, and released from custody in 2008. Castañe-da, 769 F.3d at 39. Clayton Gordon, a native of Jamaica, was arrested in Connecticut for *22 possession of cocaine with intent to distribute and was thereupon released from custody in 2008. Id. at 40. Gordon subsequently pled guilty and received a suspended prison sentence and three-year probationary term in 2009. More than four years after their respective releases from criminal custody, the government took each of the petitioners into immigration custody and charged them with removal due to their convictions. Id.

. After the panel ruled for the petitioners, the government scheduled bond hearings for each one. Before Castafieda’s bond hearing took place, the government, of its own accord, concluded that she did not pose a flight risk or a danger to the community and released her. Gordon, by contrast, made his case to an immigration judge at a bond hearing, prevailed, and was released as well. These decisions to release the petitioners do not render the present appeal moot. See Sylvain v. Attorney Gen. of U.S., 714 F.3d 150, 161 n, 12 (3d Cir.2013).

. Four other circuits have addressed the issues we address here. In Hosh v. Lucero, 680 F.3d 375, 378-381 (4th Cir.2012), the Fourth Circuit claimed to defer to Rojas. But, contra Rojas, Hosh actually assumed the "when ... *23 released” clause limited § 1226(c)(2) and concluded that the word “when” is not time-limited — a view that the BIA has never adopted. In Sylvain v. Attorney Gen. of U.S., 714 F.3d 150, 161 (3d Cir.2013), the Third Circuit avoided deciding the meaning of “an alien described in paragraph (1)” by holding for the government on the basis of loss-of-authority principles. More recently, in Olmos v. Holder, 780 F.3d 1313, 1324 (10th Cir.2015), the Tenth Circuit deferred to Rojas, as did the Second Circuit in Lora, 804 F.3d at 609-10. Numerous district courts have addressed the issue, and most have gone the other way. See Immig. Law Profs, et al. Amicus Br. at A-xxii-xxix (assembling eighty-nine cases that have rejected Rojas).

. The line between step one and step two of the Chevron analysis is not always clear. See Saysana, 590 F.3d at 13-18 (in declining to defer to the BIA’s interpretation of § 1226(c), the court relied on both step one and step two); Patricia M. Wald, Judicial Review in Midpassage: The Uneasy Partnership Between Courts and Agencies Plays On, 32 Tulsa LJ. 221, 243 (1996) (noting that whether a case is decided at step one depends on “how judges identify the precise question at issue, since at one level of generality the statute may answer it under Chevron step one, but at [another] level there may be an ambiguity”). Because we conclude that Congress spoke clearly to the relationship between § 1226(c)(1) and (c)(2), and because the precise issue Rojas decided concerned that relationship, we resolve this issue under step one.

. According to linguists, "probably the most important thing to understand” about antecedents "is that [antecedents] are not the elements in the text but are those suggested by it, those concepts being evoked or constructed in the reader’s mind.” Bonnie Lynn Nash-Web-ber, Anaphora: A Cross-Disciplinary Swvey 6 (Apr. 1977), http://hdl.handle.net/2142/17886. For discussions about how parts of speech do not dictate resolution of the linguistic issue *25 presented here, see Barbara Lust, Introduction, in 1 Studies in the Acquisition of Anaphora: Defining the Constraints 9 (Barbara Lust, ed., 1986); Ruslan Mitkov, Anaphora Resolution § 1.8, at 17 (2013); and Gillian Brown & George Yule, Discourse Analysis 203 (1983) (offering examples in which the antecedent is a part of speech that, if substituted in to the place of the cross-reference, would not yield a well-constructed sentence).

. Our colleagues argue that Rojas’s reading is reinforced by the fact that the "when ... released” clause is not aligned with subpara-graphs (A)-(D), as if the indentation means to tell the reader of the cross-reference in § 1226(c)(2) where to look in (c)(1) for the antecedent. See infra at 47-48. But we do not see how that form of presentation has any helpful bearing on the meaning of (c)(2)'s cross-reference. The limits imposed by the unindented language, including the "when ... released” clause, affect all aliens who come within the scope of (c)(1). The predicate offenses identified in the indented sub-paragraphs, by contrast, serve as independent triggers. The alignment thus flows from the structure of (c)(1) without regard to the cross-reference in the follow-on paragraph and thus offers little support for Rojas’s reading of that cross-reference.

. Our colleagues suggest that the Supreme Court has interpreted § 1226(c) as Rojas did, infra at 48-49, in Demore, 538 U.S. at 513, 123 S.Ct. 1708. But although the Supreme • Court cited (c) as a whole in the first sentence of its opinion, the Court then went on to quote in that sentence the leading language of (c)(1) — “[t]he Attorney General shall take into custody any alien who” — without referencing (implicitly or otherwise) any of the language in (c)(2). Our colleagues do not — and cannot — argue that the “when ... released” clause is irrelevant to even (c)(1). We thus do not see how the Court’s failure to refer ex *26 pressly to a clause that obviously applies to (c)(1) in its fly-by paraphrasing of (c)(1) could possibly be said to provide support for the government’s view of the particular issue we must decide, which is the relationship between (c)(1) and (c)(2). And that is particularly true as the relationship between the two paragraphs was not even at issue in Demore.

. For example, an alien may fall within § 1226(c)(1)(A) after receiving a summons and paying a fine for marijuana possession. See Immig. Law Profs, et al. Amicus Br. at 5-6. In addition, aliens defined in § 1226(c)(1)(D) are inadmissible or deporta- *27 ble solely for having engaged in certain terrorist conduct, and so criminal custody is not a necessary precondition to qualifying as a(D)-type alien.

. Under any interpretation of "released,” see H.R.Rep. No. 101-681(1), § 1503, at 148 (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6554, 1990 WL 188857 (stating that the trailing language in § 1226(c)(1) was intended to clarify that the Attorney General must "incarcerate aggravated felons upon release from confinement, regardless of whether such release involves parole, probation, or other forms of supervision.” (emphasis added)); Lora, 804 F.3d at 609-10; Kotliar, 24 I. & N. Dec. at 125; West, 22 I. & N. Dec. at 1410, some aliens who fall within the definition of subparagraphs (A)-(D) will not have been "released” as they will not have been in criminal custody of any sort.

. Tellingly, there is no indication in the record or legislative history to the IIRIRA that Congress was any more worried about the release by immigration authorities of criminal aliens already in immigration custody than about the failure of immigration authorities to take criminal aliens into custody in the first place. And thus we do not see a basis for concluding that a Congress concerned about "[ulndetained aliens,” S.Rep. No. 104-48 (1995), 1995 WL 170285, at *2, would be inclined to place a release-from-criminal-custody constraint on the discretion to take aliens into immigration custody but not on the discretion to release aliens from such custody. The puzzle, then, is why Congress would have wanted to express its unhappiness with both forms of executive discretion in the partial way Rojas favors. Notably, such different treatment would apply not only to the one type of alien who has never been released from criminal custody that our colleagues choose to mention, see infra at 54-55, but it would also implicate myriad other types of aliens that the government itself has consistently identified as falling within subparagraphs (A)-(D) but not within the (c)(1) custody directive more broadly. See, e.g., Saysana, 590 F.3d at 14.

.Our colleagues note that the description in § 1226(c)(2) of when aliens subject to that provision may qualify for release from immi *28 gration custody — when necessary for witness protection — does not refer expressly to the “when ... released" clause. See infra at 48. But (c)(2) also does not expressly refer to subparagraphs (A)-(D), yet our colleagues would not dispute that a person with no such predicate offense could not be subject to (c)(2). We thus do not believe this exception clarifies the precise issue at hand in any respect.

. In describing the "mandatory detention provision” (i.e., § 1226(c)), the panel in Saysana concluded that "the 'when released’ language serves th[e] ... limited but focused purpose of preventing the return to the community of those released in connection with the enumerated offenses [in subparagraphs (A)(D)]____” 590 F.3d at 17 (emphasis added). Saysana thus viewed the "when ... released” clause as limiting (c) as a whole, including the piece of (c) that "prevents the return to the community” (i.e., prohibits the bonded release) of certain aliens. See also Matter of García Arreola, 25 I. & N. Dec. 267, 270-71 & n. 4 (BIA 2010) (concluding that Saysana held that (c)(2) refers to and incorporates the "when ... released” clause as a constraint and thereby recognizing the conflict between Saysana and Rojas).

. The TPCR, enacted in IIRIRA § 303(b)(3), Pub.L. No. 104208, 110 Stat. at 3009-587, provides in part:
(A) IN GENERAL. — During the period in which this paragraph is in effect pursuant to paragraph (2), the Attorney General shall take into custody any alien who—
(i) has been convicted of an aggravated felony ...,
(ii) is inadmissible by reason of ...,
(iii) is deportable by reason of having committed any offense covered in ..., or
(iv) is inadmissible under ...,
when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.
(B) RELEASE. — -The Attorney General may release the alien only if the alien is an alien described in subparagraph (A)(ii) or (A)(iii) and—
(i) the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding, or
(ii) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.

. The two paragraphs in the transition rules are linked by a cross-reference ("the alien”) that differs from the one our colleagues mistakenly assign such weight in construing § 1226(c)(2) and that is, as a purely textual matter, also not clear.

. See 142 Cong. Rec. S11838-01, 1996 WL 553814 (daily ed. Sept. 30, 1996) (statement of Sen. Hatch) (explaining that one of the IIRIRA’s managers and conferees agreed to the TPCR because of the INS’s pleas of insufficient resources to comply with the AEDPA); Garvin-Noble, 21 I. & N. Dec. at 675 (same).

. Our colleagues try to downplay this anomaly by emphasizing the carve-outs in the TPCR's bar to bonded release. See infra at 54. But these carve-outs are limited ones. IIRIRA § 303(b)(3)(B), Pub.L. No. 104-2.08, 110 Stat. at 3009-587. And we think it unlikely that Congress would have intended for only the detention mandate in the transition regime — and not the detention mandate in the permanent regime — to apply to some aliens in such classes of potentially dangerous criminal aliens as unlawfully admitted aliens with a § 1226(c)(1)(A) predicate and aliens with a § 1226(c)(1)(D) predicate. It is especially unlikely that Congress would have intended the TPCR, but not § 1226(c), to operate without a release-from-criminal-custody constraint on its detention mandate when the preceding detention mandate did embody such a constraint. See AEDPA, § 440(c), Pub.L. No. 104-132, 110 Stat. 1214, 1277; see Grodzki v. Reno, 950 F.Supp. 339, 342 (N.D.Ga.1996).

. The "released after” clause would minimize the strange disjuncture between § 1226(c)(1) and (c)(2) that Rojas unavoidably creates, but we presume the coherence of the permanent detention mandate was not intended to depend on the triggering of an ancillary and potentially never operative clause in the TPCR. Whitman, 531 U.S. at 468, 121 S.Ct. 903. Regardless, the "released after” clause would do nothing to avoid the anomaly of the permanent mandate being less sweeping in a key respect than the transition mandate had been.
Our colleagues, but not the government or Rojas itself, contend that the canon against surplusage supports Rojas’s reading of the cross-reference in § 1226(c)(2) because otherwise "when ... released” would be duplica-tive of "released after.” See infra at 48-49. But to the extent this argument has any force, it has it only if "when” has a time-limited meaning. The surplusage concern thus provides no basis for concluding that Rojas is right to treat the “when ... released” clause as a whole as irrelevant to (c)(2). As a result, we consider this surplusage argument when we turn to the issue of what "when” means— an issue on which we owe the BIA no deference and which we must confront only if the "when ... released” clause does apply to all of (c).

. Our colleagues’ reading of the fourth sentence of the report, see infra at 49-50, takes "the Attorney General’s custody” referenced in that sentence to be any custody, even if effected as a matter of discretion under § 1226(a), rather than to be the mandatory custody of the Attorney General under § 1226(c) that — on our colleagues’ reading of the report — the preceding sentences had necessarily just referenced. And our colleagues read the reference to "such an alien” in that sentence to be a reference only to an alien who has committed an (A)-(D) offense rather than to an alien who was taken into custody pursuant to the duty imposed by (c)(1) as a whole. See id. But the text does not resolve whether our colleagues are right to read these words this way, as these words on their own do not tell us whether the report treats the "when ... released” clause as if it were incorporated as a limitation on the bar to bonded release.

. The BIA’s decision in Eden, as our colleagues point out, did not involve the particular timing element involved in this case. But that is no matter as Eden is directly on point as to the precise issue for which the government seeks Chevron deference — that is, the relationship between the "custody” and "release” aspects of the present detention mandate. Our colleagues contend otherwise as follows. Our colleagues suggest that even if the BIA in Eden had reached the same result by concluding, instead, that once an aggravated felon was in immigration custody he could not then be released on bond (regardless of whether he had ever been released from criminal custody), the BIA still would have had reason to consider the meaning of the "upon completion” clause. And that is because, our colleagues contend, the BIA would have had an interest in clarifying whether the Attorney General had the authority to place an alien in immigration custody at all, even discretionarily, while that alien was still serving his criminal sentence. See infra at 56. But the BIA had no need to clarify the meaning of the “upon completion” clause for that distinct purpose. And that is because, as the BIA in Eden acknowledged, an alien could have been taken intp immigration custody under the discretionary detention authority conferred by the then-equivalent to § 1226(a). In fact, the immigration judge in Eden granted discretionary bond to the alien in that case under the then-equivalent of § 1226(a), which occasioned the appeal to the BIA by the executive. See Eden, 20 I. & N. Dec. at 210, 212 (noting that the immigration judge had concluded that the alien "had been properly detained under [the then-equivalent of § 1226(a) ]” and framing the question on appeal in terms of whether "authority to detain [an alien while he was on parole] pursuant to [the then-equivalent of § 1226(c)] ... exist[ed]” (emphasis added)).

. Congress replaced the “upon completion’’ clause with “upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense).” Immigration Act of 1990, § 504(a), Pub.L. No. 101-649, 104 Stat. 4978, 5049-50; H.R.Rep. No. 101-681(1), § 1503, at 148 (1990).

. We do not find our colleagues’ contrary reading of the 1990 House report — in which Congress was supposedly responding to a concern that the "upon completion” clause might be read to displace, as to aliens on parole, the Attorney General’s general and unqualified grant of discretionary authority to take aliens into immigration custody, see infra at 56-57 — persuasive. Congress was responding to Eden and the immigration judge in that case did clearly conclude that the Attorney General had the authority to place an alien on parole in immigration custody under the then-equivalent of § 1226(a). See Eden, 20 I. & N. Dec. at 210. In offering a contrary reading of the report, our colleagues ignore the introductory sentence of the relevant portion of the report, which we read to supply the context for the sentences that follow: "Current law ... requires INS to incarcerate alien aggravated felons without bond immediately upon completion of the alien’s criminal ‘sentence.’ ” H.R.Rep. No. 101—681(1), § 1503, at 148 (1990) (emphasis added). We therefore read the sentences that follow to be referring to the authority to incarcerate aliens without bond under the mandatory detention provision. See id.

.District courts held that the AEDPA did not apply retroactively to aliens who had been convicted and released from incarceration before its enactment in part because the "upon release” clause implicitly limited the application of the detention mandate, including the aspect of the mandate governing bonded release, to people taken into custody after the AEDPA’s passage. See, e.g., DeMelo v. Cobb, 936 F.Supp. 30, 36 (D.Mass.1996), vacated as moot after the IIRIRA's passage, 108 F.3d 328 (1st Cir.1997) (per curiam) (concluding "that the language 'upon release of the alien from incarceration' implies a time of release after the effective date of the Act” and thus makes the detention mandate as a whole prospective in application); Villagomez v. Smith, No. C96-20 1141C, 1996 WL 622451, at *2 (W.D.Wash. July 31, 1996) (unpublished) (stating that the AEDPA’s detention mandate as a whole cannot apply to aliens convicted and released before its enactment because of the "straightforward” "upon release” language); Montero v. Cobb, 937 F.Supp. 88, 95 (D.Mass.1996); In re Reyes, Case No. B-94-80 (S.D.Tex. May 31, 1996); see also Grodzki, 950 F.Supp. at 342 (holding that the "upon release” language "at least implies that custody commence within a reasonable time after *34 release from incarceration” and thus that petitioner was entitled to individualized bond hearing given the lapse in time between when he was released from incarceration and when he was taken into immigration custody).

. Our colleagues, see infra at 55-56, following Rojas's lead, see Rojas, 23 I. & N. Dec. at 122-24, find instructive the 1991 revision to an exception to the bar to bonded release contained in the 1990 detention mandate. See Immigration Act of 1990, § 504(a), Pub.L. No. 101-649, 104 Stat. 4978, 5049-50; Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, § 306(a)(4), Pub.L. No. 102-232, 105 Stat. 1733, 1751. Rojas contends that the text of the exception to the bar to bonded release (set forth in the revised version of paragraph (B)) shows that the "upon release” constraint in the then-effective detention mandate (set forth in paragraph (A)) limited neither the class of lawfully admitted aliens referenced in (B)’s exception nor "such felon[s]” referenced in (A)'s bar to bonded release. 23 I. & N. Dec. at 124. But as the legislative history just described shows, in crafting that 1990 detention mandate, Congress plainly did intend for the "upon release” requirement to modify the “such felon[s]” who were subject to (A)'s bar to bonded release. We thus see no basis for concluding that Congress suddenly intended to alter the relationship between the "upon release” and "such felon” clauses in paragraph (A) in 1991 by way of a technical amendment to paragraph (B) that does not appear to have been made for any such consequential purpose. See Cong. Research Serv., Summaries for Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (H.R.3049, 102nd Cong.), https:// www. govtrack.us/congress/bills/102/hr3049/ summary (summarizing the 1991 revision as applying the exception in (B) to all "lawfully-admitted aliens” as opposed to just aliens "lawfully admitted for permanent residence”). Consistent with a modest understanding of the 1991 technical revision’s import, we read (B)- — by virtue of the fact that (A) is "subject to paragraph (B)” — to refer merely to a subset of "such felon[s]” in (A), which is to say felons taken into immigration custody "upon release.” In any event, we question the salience of paragraph (B) for present purposes given that it had been deleted by the AEDPA by the time Congress got around to enacting the IIRIRA, see AEDPA § 440(c), 110 Stat. at 1277.

. Our colleagues find support for Rojas in Congress’s evident intent to make it more difficult for certain criminal aliens to obtain relief from a final order of removal, see infra at 51-52, on the apparent assumption that the risk of flight is greater for aliens who are more certain to be removed (and this class is an especially dangerous one). But the petitioners have not yet faced a definitive adverse judgment in their removal proceedings and so may not in fact be removed. Moreover, aliens taken into custody under § 1226(c) may also have a basis for discretionary relief in the form of cancellation of removal, see Lora, 804 F.3d at 606-07, 615-16, or some other form of relief, such as a U Visa (a type of visa set aside for victims of certain crimes). We thus see no justification for the inference that Congress, in making it harder to get relief from a final removal order, must have intended to deny bond to those who might not be ordered removed at all. In fact, as Congress surely knows, an alien’s inability to get bonded release can limit the alien's capacity to obtain legal representation or otherwise obtain relief from removal, see Robert A. Katzmann, The Legal Profession and the Unmet Needs of the Immigrant Poor, 21 Geo. J. Legal Ethics 3, 10 (2008); Moncrieffe v. Holder, - U.S. -, 133 S.Ct. 1678, 1690, 185 L.Ed.2d 727 (2013), making the impact of mandatory detention prior to a final removal order especially harsh in cases where avenues for relief following such order have been curtailed.

. Although the government suggests that Rojas construed "when” to mean, in effect, "any time after,” Rojas did not, as it held that the word was irrelevant to § 1226(c)(2)’s operation. The government reads too much into Rojas’s assertion that the "when ... released” clause "specifies[s] the point in time at which [the Attorney General’s] duty [under (c)(1)] arises." See Rojas, 23 I. & N. Dec. at 121. In so stating, Rojas merely clarified that "when ... released” modifies "take into custody” rather than the "alien” in (c)(1), not that "when” imposes no deadline. In fact, the BIA has seemed to set forth a time-limited meaning of "when” several times. See id. at 122; see also Matter of Saysana, 24 I. & N. Dec. 602, 607 (BIA 2008); Matter of Valdez-Valdez, 21 I. & N. Dec. 703, 708 (BIA 1997). The government's interpretation of the meaning of the word "when” is thus not entitled to Chevron deference. Given that the BIA’s position on the meaning of "when” is at worst inconsistent and at best consonant with petitioners’ time-limited reading, we also would not defer under Skidmore to such an interpretation, assuming Skidmore deference even applies to the government’s litigating position in this case. See Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (stating that the opinion of an agency is entitled to respect only to the extent it has the “power to persuade”).

. The Rojas concurrence suggested that the "when ... released” clause in (c)(1) does not impose a timing constraint because it modifies only the offenses denominated in subpar-agraphs (A)-(D) of (c)(1), rather than the duty to "take into custody." See Rojas, 23 I. & N. Dec. at 128-29 (Moscato, concurring and dissenting). Neither the BIA, the government, nor our colleagues advance this view, however, and we see no basis for this view given the structural placement of the clause.

. The government and our colleagues contend that it is implausible that Congress would have exempted aliens from § 1226(c) merely in consequence of the remoteness of their release from criminal custody given that such a gap in custody might be attributable to other forces. See Gov. Br. at 8-9; see infra at 51-52. For example, the government and our colleagues point to evidence that some state and local authorities may frustrate the ability of the Attorney General to place aliens in custody in a timely fashion under (c)(1). Id. But the agency charged with administering the Act has not purported to define the word ''when” or its temporal bounds, let alone how such period of time should be tolled in the circumstances the government and our colleagues identify or in other circumstances that might arise, such as when an alien receives a non-carceral sentence. See Lora, 804 F.3d at 609-10; Kotliar, 24 I. & N. Dec. at 125; West, 22 I. & N. Dec. at 1410. We do not believe that such fact-specific questions about tolling provide a basis for concluding that "when” is best read in context to mean “if” or "any time after,” given the other evidence of legislative intent.

. Our colleagues contend that the petitioners’ view of "when” would be at odds with the canon against surplusage in light of the "released after” clause of the IIRIRA § 303(b)(2). But we do not see how. At worst, the "released after” clause is a clarifying provision in an ancillary and potentially never operative measure. Cf. In re Fahey, 779 F.3d 1, 7 (1st Cir.2015) (indicating that language that is not strictly speaking necessary, if nonetheless clarifying, need not be thought to run afoul of the canon against surplusage). That is because the "released after” clause appears to have been intended to clarify which rules would apply to existing detainees when the TPCR expired. Aliens who were immediately taken into immigration custody upon their release from criminal custody during the transition period were subject to the restrictions on bonded release imposed by the TPCR. While the IIRIRA § 303(b)(2) did state the effective date of the new permanent rules § 1226(c) set forth, the “effective date” clause did not make clear whether the permanent rules or the by-then-expired TPCR rules would govern those persons in mandatory detention when the TPCR expired. Thus, the "released after” clause in the IIRIRA § 303(b)(2) would seem to have been intended to perform the useful function of making clear — as part of a savings clause, see Garvin-Noble, 21 I. & N. Dec. at 681; Adeniji, 22 I. & N. Dec. at 1110-11 (emphasizing "uncertainty ... in discerning how Congress expected the [released after] provision to operate,” given that Congress may have "intended” but inadvertently “neglect *39 ed” to incorporate this provision into a broader savings clause in the TPCR) — that § 1226(c) would apply only to aliens released from criminal custody "after” the transition period. Conversely, the old TPCR rules for mandatory detention would continue to govern aliens held in mandatory detention pursuant to those transition rules. Thus, the "released after” clause is by no means unnecessary if "when” conveys immediacy. A misplaced concern about surplusage thus should not dictate a meaning of the word “when” that is so at odds with the text, structure, and legislative history. See King v. Burwell, - U.S. -, 135 S.Ct. 2480, 2492-93, 192 L.Ed.2d 483 (2015).

. In fact, as we have noted, just prior to conference on the IIRIRA, a leading Senate sponsor of the IIRIRA described § 1226(c) as "ensuring] that aliens who commit serious crimes are detained upon their release from prison until they can be deported____” 142 Cong. Rec. S10572-01 (daily ed. Sept. 16, 1996), 1996 WL 522794 (statement of Sen. Simpson) (emphasis added).

. Our colleagues, in concluding that "when” merely expresses a preference for timely action, do not rely on loss-of-authority principles. See infra at 58-59. They instead reason that even if Rojas is wrong, whether an alien was timely taken into immigration custody is just an exogenous fact and thus does not have any bearing on the class of aliens to whom § 1226(c) applies. See id. If we follow, the suggestion appears to be that the word "released” and the trailing portions of the "when ... released” clause do refer to something endogenous to the alien and thus do characterize the alien to whom (c) applies, even though the word “when” does not. But aliens do not release themselves any more than they choose when they are released. We thus do not see how the line between exogenous and endogenous facts could be drawn so finely as to attribute to Congress an intent to carve up the "when ... released" clause in this odd way, even if there were any textual basis for construing the Attorney General’s duty under (c) as being limited by facts endogenous to the alien rather than by all relevant ones. And, as noted, there is no textual basis for concluding that the word "when”— and whatever limitations that word imposes— does not constrain the application of (c)(1), as the word clearly and unconditionally modifies the Attorney General’s directive to "take into custody.” The only possible textual hook for distinguishing between endogenous and exogenous facts, therefore, resides in (c)(2)’s "described in” language. But making a distinction on this basis for the purpose of understanding the bounds of the Attorney General’s duty under (c) would still create an arbitrary line-drawing problem. And such a distinction would also incongruously de-link the custody directive in (c)(1) from the bar to bonded release in (c)(2) by subjecting the custody directive to a timing constraint not applicable to the bar to release.

. That Congress intended to craft a relatively narrow detention mandate is hardly implausible: After all, Congress did not adopt the recommendation in the 1995 Senate report to expand the class of aliens subject to mandatory detention to "all criminal aliens.” See S.Rep. No. 104-48 (1995), 1995 WL 170285. Rather, setting aside any limitations imposed by the "when ... released” clause, Congress limited mandatory detention under § 1226(c) to aliens who have committed certain enumerated offenses and who were "released after” the TPCR expired (by virtue of the IIRI-RA § 303(b)(2)); see also Saysana, 590 F.3d at 15-16 (holding that § 1226(c)(1) is not triggered until an alien is released from custody for having committed an offense specified in subparagraphs (A)-(D), as opposed to being triggered by release from any type of criminal custody).

. The Second Circuit held that, to avoid "serious constitutional concerns,” § 1226(c) "must be read as including an implicit temporal limitation,” such that aliens taken into immigration custody pursuant to § 1226(c) cannot be held without a bond hearing for more than six months. Lora, 804 F.3d at 614-15. In so holding, the Second Circuit noted that indefinite detention "has real-life consequences for immigrants and their families,” and that it is particularly concerning when "[n]o principled argument has been mounted for the notion that [the detainee] is either a risk of flight or is dangerous.” Id. at 615-16.

. Our colleagues’ gardening example is of little help in establishing the context for discerning Congress’s intent in enacting a detention mandate that "touches upon matters of both personal liberty and the control of our nation's borders.” See infra at 49. As for our colleagues' suggestion that Congress had "no good reason” to distinguish between aliens timely taken into custody and aliens not timely taken into custody, our prior decision in Saysana supplies a compelling reason, see Saysana, 590 F.3d at 17, as does Congress’s treatment of § 1226(a) as a backstop source of detention authority.

. In fact, the legislative history accords with the notion that Congress wanted to limit § 1226(c) to aliens coming right out of criminal custody in order to help immigration authorities conserve scarce detention bed space so that aliens who needed to be detained under § 1226(a) could be. See Criminal and Illegal Aliens: Hearings Before the Sub-comm. on Immigration and Claims of the House Comm, on the Judiciary, 104th Cong. (Sept. 5, 1996) (statement of David Martin, General Counsel of INS) (noting that criminal aliens subject to the AEDPA’s detention mandate imposed severe burdens on detention bed space and crowded out space for aliens who did not come within such mandate and only discussing efforts by immigration authorities to take aliens into custody just as they were leaving incarceration); Amicus Br. of Frm. Imm. Judges and DHS Sec. Officials at 17-20 (describing scarce detention bed space).

. The Supreme Court's decision in Barnhart, 537 U.S. at 152, 123 S.Ct. 748, is similar. The appellants argued that a certain provision of the Coal Act specified the consequence for the government’s failure to timely comply with another provision, id. at 153, 163, 123 S.Ct. 748, but the Court rejected this argument because the Coal Act’s text did not expressly link the two provisions and there was evidence to suggest that Congress did not think of the two provisions as related. Id. at 163-65, 123 S.Ct. 748. Moreover, the Court reasoned that it was implausible to think that Congress would have wanted that separate provision to control as a policy matter, so the consequence was untenable. Id. at 164, 123 S.Ct. 748. Here, of course, Congress expressly styled § 1226(c) as an exception that restricts the power otherwise granted under (a), so the asserted consequence is clearly linked to the asserted act of noncompliance. And, for the reasons discussed, we hardly think it is counterintuitive for Congress to have intended that (a) would control if (c)’s conditions are not met.